Submitted on briefs September 19, reversed November 8, petition
for rehearing denied December 19, 1950

IN THE MATTER OF THE GUARDIANSHIP OF THE ESTATE OF
HAZEL HAMPSON, A MENTALLY ILL PERSON
## SHAW *v.* CHRISTOFFERSEN
223 P. (2d) 1039

In Banc.

*Leo Levenson* and *William J. Prendergast, Jr.,* of Portland, filed a brief for appellant.

*A. M. Hodler,* of Portland, filed a brief for respondent.

HAY, J.

This is an appeal from an order of the circuit court for Multnomah County, department of probate, ap-

pointing a guardian of the Estate of Hazel Hampson, an incompetent person.

On November 8, 1949, on the application of Hazel Hampson stating that she deemed herself unfitted to manage her affairs with prudence and understanding, said court, acting under the provisions of § 3, chapter 524, Oregon Laws 1947, appointed Holger Christoffersen as conservator of her property. On November 10, 1949, said court adjudged Mrs. Hampson to be a mentally ill person, and committed her to the Oregon State Hospital. On December 23, 1949, Alma Bloch Shaw, a sister of said Hazel Hampson, petitioned the court to be appointed as guardian of Mrs. Hampson's estate. The petition was assented to and united in by all of Mrs. Hampson's next of kin. It recited that Mrs. Hampson is of the age of 56 years, and that she is the owner of real and personal property in Multnomah County of the reasonable value of more than $70,000, which property produces an income of about $600 a month, and requires management and care; that Mrs. Hampson suffers from polyneuritis and is paranoid, delusional and a distracted person and wholly incapable of managing her property or affairs, and that a guardian should be appointed to manage her estate; and that petitioner is a capable, suitable and proper person to be appointed such guardian. It prayed that the conservatorship be terminated, and that petitioner be appointed guardian as aforesaid.

The conservator, Holger Christoffersen, answered the petition, admitting the formal allegations and generally denying the remainder. For an affirmative defense he alleged that he is an old friend of Mrs. Hampson's, has known her for many years, and is familiar with her property; that since his appointment

as conservator of her estate he has diligently managed and taken care of her property, and has obtained increases in the rental income thereof; and that, because of his intimate and familiar knowledge of such property, his management of Mrs. Hampson's affairs should not be disturbed, and he should be retained as custodian. He alleged further that he is in all respects competent and qualified to act as guardian of Mrs. Hampson's estate, and prayed to be appointed as such. Issue was joined upon the affirmative allegations of the answer, and, after a hearing, the court, on June 1, 1950, entered an order appointing Holger Christoffersen guardian of the estate, and fixing his bond in the sum of $10,000.00. The petitioner, Alma Bloch Shaw, has appealed.

Error is assigned upon the appointment of a stranger to the ward as guardian of the estate instead of a sister, when the evidence supported a finding that the sister was equally qualified.

■ It is conceded that Mrs. Hampson was totally incompetent, and the evidence confirms this. The statute providing for the appointment of conservators is vague as to a conservator's duties, but, as he is required to give bond "as guardians are required to do and be subject to all provisions of law relating to guardians so far as they apply to the estates of their wards", it would seem that a conservator is a sort of temporary guardian, having the duty of conserving the property of his ward until such time as a guardian is appointed.

Section 22-120, O. C. L. A., prescribed the qualifications of guardians and the order of preference in their appointment. By that section, a guardian was required to be a citizen of the United States and a resident of the state of Oregon, of good moral character,

and otherwise competent to the satisfaction of the court. Preference was to be given to the father, mother, adult brother, sister or other near relative of the ward, in the order named. That section, however, with other provisions of the code relative to the appointment of guardians, was repealed by chapter 524, Oregon Laws 1947, and the repealing act failed to specify, except in the case of guardians of minors, what should be the qualifications of a guardian. The act did, however, (§ 2) provide that guardians and conservators should have the same qualifications as executors and administrators. Section 19-210, O. C. L. A., provides that letters of administration upon the estate of a decedent shall be granted "(1) To the widow, widower or next of kin in the discretion of the court. * * * (4) To any other person competent and qualified whom the court may select; * * *" Section 19-216, O. C. L. A., specifies what persons are not qualified to act as executors or administrators, but it has no bearing upon any issue in the present case.

■ The petitioner apparently concedes that the selection of a guardian for an incompetent adult is a matter which is within the sound discretion of the appointing court, but contends that, other things being equal, preference should be given to a blood relative of the ward's. It has been said that a court's discretion in this connection "must be exercised in the light of the nature of the property to be managed by the guardian, the relationship of the applicant to the incompetent person, and the interest the applicant has, if any, with the incompetent person in the property." *In re Wood,* 110 Wash. 630, 632, 188 P. 787.

Mr. Christoffersen is not related to the incompetent. Under the statute, he is guardian both of her person and her estate. § 12, Chap. 524, Oregon Laws 1947. The

fact that he is a stranger, therefore, should have been considered by the court in the exercise of its discretion in appointing him guardian. Moreover, it would seem that the legislature intended to require the court, in its discretion, to give preference to the next of kin. We are assuming that the ward's father and mother are dead.

■ The conclusion at which the trial court arrived in the exercise of its discretion is entitled to great weight on appeal. *In re Mignerey,* 11 Wash. 2d 42, 118 P. 2d 440, 443. If the court's conclusion, under the circumstances, was "not in conformity with the spirit of the law", its action may be reversed on appeal. *Riverside Cement Co. v. Masson,* 69 Or. 502, 511, 139 P. 723.

Generally, the court has a reasonable discretion in the premises, and may appoint such person as guardian as it deems most suitable and proper. It is not necessarily bound to appoint a relative of the incompetent. 4 Bancroft's Probate Practice, p. 2053, § 1277; Woerner, Guardianship, p. 429, § 133; 39 C. J. S., Guardian and Ward, p. 23, § 12.

"Factors influencing exercise of discretion. In the selection of a guardian or committee for a mental incompetent the controlling consideration is the welfare of the incompetent; but, subject to this paramount consideration, in the selection of the guardian or committee the court will exercise the greatest care in order that the rights of all parties interested may be best subserved. The court should consider the suggestions or recommendations of persons interested in the proceedings, including those of the lunatic himself, and may follow the rule of appointing him who is recommended by the greatest number of those entitled to be heard. Where the committee must maintain intimate relations with the relatives, their wishes and interests, if they coincide with the incompetent's welfare and happi-

ness, should be considered, and ought not to be ignored. However, the court is not bound by the suggestions of the interested persons, nor is it required to follow the wishes of the incompetent himself." 44 C. J. S., Insane Persons, p. 125, § 42.

■ There is a presumption that the next of kin of the incompetent will be more likely to treat her with patience and affection than will a stranger. For that reason, consanguinity is considered as a recommendation in the selection of a guardian, and will not be disregarded except upon strong grounds. Woerner, Guardianship, p. 437, § 133; *Sullivan v. Dunne,* 198 Cal. 183, 194, 244 P. 343; *In re Rothman,* 263 N. Y. 31, 32, 188 N. E. 147; *In re Dietz,* 247 App. Div. 366, 287 N. Y. S. 392, 394; *In re Williams' Committee,* 252 App. Div. 314, 298 N. Y. S. 881, 882.

"The law in dealing with the persons and estates of that unfortunate class who are bereft of reason and intelligence, proceeds upon principles which must commend themselves to the sanction and approbation of every humane and enlightened mind. Considering the close and intimate relations which the committee must maintain with the family and relatives of the lunatic, his power of control—all but absolute—over his person and property, the remote possibility of his ever being in a condition to make any disposition of his estate which shall prevent its descent and transmission to the heirs at law and next of kin, a rule of practice or of positive legislation which would justify the appointment of a stranger to execute the trust of committee, without the assent and against the will of his family or other relatives, and without any sufficient or adequate cause, would be oppressive and intolerable. It would be little less offensive than to deprive a person of his property without cause, and without the authority of law." *In the Matter of Lamoree,* 32 Barb. (N. Y.) 122, 125.

We do not say that, if a qualified blood relative is willing to act, the appointment of a stranger as guardian is necessarily an abuse of discretion. We feel, however, that a qualified blood relative should, as a general rule, have preference, and that a stranger should not be appointed in preference to such qualified blood relative without stronger reasons than appear in the case at bar.

The trial judge took note of the fact that both Mrs. Shaw and Mr. Christoffersen had had considerable experience in the management of apartment house properties, which is the kind of property possessed by the incompetent herein, although he felt that Mr. Christoffersen's experience had been more extensive. The judge apparently recognized, however, that a qualified blood relative should ordinarily be preferred over a stranger. In a memorandum opinion, he said, in part: "The court was not too well impressed with Mrs. Shaw's testimony for the reason that many times, during her examination, she appeared rather evasive, and, as a consequence, the court does not give the weight to her testimony that might have been given had she been more frank and straightforward." As to this, we have carefully read the transcript of Mrs. Shaw's testimony, and, in our opinion, the only matter in respect of which she gave any indication of evasiveness was on examination by the court with reference to whether or not she would expect to be paid for her services if she were appointed as guardian. We think that her testimony demonstrates that she did not intend to be evasive, and, to that end, we quote it, as follows:

"The Court: Q. I just want to ask you with reference to that last question that was just put to you: how would it save money for your sister for you to manage in preference to anybody else? A.

Because I think I would have her interests at heart more than some stranger, as being one of the family.

"Q. You would expect to be paid? A. Well, I might have to have something to help me out, you know, in case I need repairs.

"Q. I mean for your services? A. Yes.

"Q. You would expect to be paid? A. Well, for my expense, any expense that I might have, yes.

"Q. You mean to tell me that you would manage the property free, for nothing, as long as the repairs and expenses of operation were paid from the estate of your sister? A. Well, I hadn't given that any consideration.

"Q. Well, let's give it some consideration now: you are asking to be appointed guardian of your sister and her property. Now, if you were put in charge of all her property, naturally there are expenses— A. (Interrupting) Yes; I would expect to be reimbursed.

"Q. They would be paid from her own money? A. Yes.

"Q. Now, for yourself, individually, do you mean to tell me that you would take this chore over and operate these several apartments without charge to your sister? A. Well, that would depend upon how much of my time it took, of course.

"Q. There are three apartment houses with 30 tenants; now wouldn't that take most of your time? A. Well, you see, that 12th street property takes care of itself, and it has for years and years; it has been leased. Now, whether it is at the present time, or not, I don't know, but there's very good tenants in there; Mr. Caldwell has dealt with them for years, and they take care of the building; and I know that Mrs. Hampson hasn't given that any time for years.

"Q. Getting back to you, as an employee— A. Yes.

"Q. You would expect to be paid each month for your services devoted to the operation of these apartment houses, would you not? A. I believe that

is customary; I believe Mr. Christoffersen has been paid.

"Q. You side-step again: I want to know whether you are expecting to be paid as anybody else would be paid, or are you going to do it for nothing? A. I wouldn't expect to charge as much as a stranger.

"Q. You would do it for less than a stranger? A. Yes.

"Q. But you would expect to be paid? A. Well, I haven't given that any thought.

"Q. Do you mean to tell me that you have made application to be appointed guardian to manage this property and never thought about whether you were going to be paid for your services? A. Never thought about the question of anything like that.

"The Court: That's all; that's all."

It seems not improbable, as the trial judge believed, that the management of the ward's property would consume most of the guardian's time. Mr. Christoffersen, who was appointed guardian, is chief criminal deputy sheriff of Multnomah County, a very responsible and onerous official position. The evidence indicates that he is subject to call twenty-four hours a day, and that his official duties permit him little leisure. It would seem that Mrs. Shaw has more time available to attend to guardianship affairs than Mr. Christoffersen has.

■ As for the guardian's compensation, the amount to be allowed therefor is determined by the court, and not by the guardian. Ch. 524, Oregon Laws 1947. Whether the guardian expects much or little in that connection is, therefore, immaterial.

■ Quite apart from the question of the impropriety of appointing a stranger in preference to a qualified blood relative of the incompetent, we feel that the appointment of a deputy sheriff of the county in which the court sat as guardian of a ward of the court was

in itself an abuse of discretion. There is no statutory prohibition against the appointment of a public official possessing the proper qualifications as guardian of an incompetent person, and, generally, such an appointment is not improper. 44 C. J. S., Insane Persons, p. 127, § 44. There is impropriety, however, in the appointment by a judge of one of his own relatives, or of an officer or attache of his own court, as an executor or administrator. 33 C. J. S., Executors and Administrators, p. 953, § 46. So, the appointment by a judge of his own son as administrator of a decedent's estate has been characterized as indicating a want of judicial delicacy or propriety, and as being manifestly improper. *Plowman v. Henderson,* 59 Ala. 559, 564. The appointment of one of the masters of a court of chancery as guardian of the estate of a minor was condemned by the Lord Chancellor as "mischievous". He said:

"* * * that he was unwilling to break in upon what had been the practice without very sufficient reason: but if he sat here long enough, he certainly should alter the rule by which one of the masters of the Court is assigned to be the guardian of the fortune of infants.

"The guardianship of the master must be merely nominal: More could not be expected. It was right enough where there was a total absence of all family connexions to give proper protection as a last resort to make the master the guardian: but to do it as the general course was mischievous. In substance it is appointing the receiver guardian of the estate." In re Sullivans, Minors, 1 Molloy 225.

■■ The sheriff is a county officer representing the executive or administrative power within his county. Bouvier, L. D., Rawle's Third Rev., 3058. In the execution of his office it is his duty to attend the terms of

the circuit and county courts held within his county, to execute their process and orders, and to obey their lawful orders or directions. § 93-933, O. C. L. A. The declared public policy of the state prohibits the sheriff "or any sheriff's officer" during his continuance in office, from acting or having a partner who acts as an attorney at law. § 93-940, O. C. L. A. This indicates the legislative intention to insure that the sheriff shall be impartial between litigants and in respect of any cause or matter before the courts. On principle, the rule should disqualify the sheriff from acting as guardian of a ward of the court of which he is an officer. In our opinion, it is an abuse of discretion to appoint a sheriff or any other officer or attache of the probate court as guardian of the estate of a ward of the court. Disqualification of a sheriff in a particular matter extends to his deputies. 57 C. J., Sheriffs and Constables, p. 778, § 133. In appointing Deputy Sheriff Christoffersen as guardian in the premises, therefore, the court erred.

In thus holding we are not to be considered as casting any aspersions on the character of Mr. Christoffersen or on his actions in relation to the present matter. On the contrary, the evidence indicates that he has been diligent and industrious in his administration of the property and affairs of the incompetent. That fact, however, does not counterbalance the impropriety of his appointment.

The order appealed from will be reversed. The petitioner, Alma Bloch Shaw, appearing to possess the necessary qualifications, is appointed guardian of the estate of Hazel Hampson, an incompetent person, and letters of guardianship thereon will issue to her upon her filing in the probate court the bond required by law in the sum of $10,000.00 and its approval by the court. No costs will be allowed to either party.